# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

STEPHEN MCCARTHY  :

         *Appellant*  :  No. 24-2704

    v.  :

         :

DRUG ENFORCEMENT  :
ADMINISTRATION  :

         :

---

## BRIEF OF THE APPELLANT

---

*Appeal from the order of the Drug enforcement Administration entered August 19, 2024, revoking DEA Certificate of Registration No. MM3329578 issued to Stephen McCarthy and further denying any pending applications of Stephen McCarthy P.A. to renew or modify his registration as well as any other pending application of Stephen McCarthy P.A. for additional registration in Pennsylvania*

---

Daniel A. Pallen, Esquire
**THE LAW OFFICES OF
DANIEL A. PALLEN, P.L.L.C.**
PA Attorney ID: 207001
114 West Front Street
Media, PA 19063
(484) 550-7542
(484) 550-7532 *fax*

# TABLE OF CONTENTS

I. STATEMENT OF JURSIDICTION..................................................................1

II. ORDER(S) IN QUESTION…………………………...……………...2

III. STANDARD OF REVIEW…………………………………………….3

IV. CONCISE STATEMENT OF THE CASE……………………..………4

    A. Procedural History…………………………………………………4

    B. Narrative History………………………………………………..6

V. STATEMENT OF ISSUES FOR REVIEW…………………………...9

VI. STATEMENT OF RELATED CASES AND PROCEEDINGS………10

VII. SUMMARY OF THE ARGUMENT………………………………….11

VIII. ARGUMENT…………………………………………………………...12

    A. The DEA Appointment Process of ALJs Violates
       the Appointments Clause…………………………………………...14

    B. The Statutory Removal Restrictions on DEA ALJs
       Violate Article II Making the Underling Proceedings
       Against (McCarthy) Unconstitutional………………………….....18

    C. The Recommended Decision of the ALJ (Adopted by the
       DEA is Arbitrary and Capricious. Discretion was Abused………….25

IX. APPELLANT IS ENTITLED TO A STAY PENDING APPEAL…….36

X. CONCLUSION…………………………………………………….....37

# TABLE OF AUTHORITIES

*Page*

**<u>Cases</u>**

*ALRA Labs, Inc. v. DEA*,
54 F.3d 450 (7th Cir. 1995)…………………………………………………..28

*Ascent Pharmaceuticals v. Garland*,
Case 2:23-cv-08260 (E.D. N.Y. 2024)………………………………...…….16-17

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
598 U.S. 175 (2023)…………………………………………………………37

*Chein v. DEA,*
533 F.3d 828 (2008)…………………………………………………………...3

*Federal Housing Finance Agency in Collins v. Yellen*,
141 S. Ct. 1761 (2021)…………………………………………………20, 23

*Free Enterprise Fund v. PCAOB*
561 U.S. 477 (2010)………………………………………...…………….20-22

*Hoxie v. DEA,*
419 F.3d 477 (6th Cir. 2005)………………………..………………………26

*Jarkesy v. Securities and Exchange Commission*,
34 F.4th 446 (5th Cir. May 18, 2022)……………………………..11, 18, 20-21

*Lucia v. SEC*,
585 U.S. 237 (2018)……………………………………...…….11, 13, 15, 17

*MacKay v. DEA*,
664 F.3d 808 (10th Cir. 2011)……………………………………….…26

*Reilly v. O'Malley*,
2024 U.S. Dist. LEXIS 13176 (E.D. Pa. Jan. 25, 2024)……………………………23

*Rizvi v. Kovach*,
2021 U.S. Dist. LEXIS 154412 (E.D. Pa. Aug. 16, 2021)………………………26

*Rowe v. Kijakazi*
2023 U.S. Dist. LEXIS 57593 (M.D. Pa. Mar. 31, 2023)…………………….…23

*Ryder v. United States*,
515 U. S. 177 (1995)…………………………………………………....17

*SEC v. Jarkesy*,
143 S. Ct. 2688 (2023)…………………………………………………11, 19

*SEC v. Jarkesy*,
144 S. Ct. 2117, (2024)……………………………………………………….20

*Space Expl. Techs. Corp. v. NLRB*,
2024 U.S. Dist. LEXIS 129439 (W.D. Tex. July 23, 2024)……………….………19

*St. Croix v. DEA*,
No. 21-1116, 2022 U.S. App. LEXIS 16183 (D.C. Cir. June 10, 2022)……3, 29, 31

*Stamm v. Kijakazi*,
577 F. Supp. 3d. 358, 366 (M.D. Pa. 2021)…………………………………..…23

*United States v. Lippner*,
676 F.2d 456, 460 (11th Cir. 1982)…………………………...………………..2

**Statutes/Rules**

5 U.S.C. § 556(c) …………………………………………...…………..…………13

5 U.S.C. § 706(2)(A) ……………………………………………...……………..…3

5 U.S.C. § 1202(d) …………………………………...……………….……22

5 U.S.C. § 3105…………………………………………………………....…12

5 U.S.C. § 7521(a) ……………………………………………………………22

5 U.S.C. § 7521(b) …………………………………………………………22

21 U.S.C. §§ 823(f)…………………………………………...…………….…..2, 30

21 U.S.C. § 823(g)(l) …………………………………………….…….…4

21 U.S.C. § 824………...………………………………………………….12

21 U.S.C. § 824(a)(4)…...…………………………………….…4, 6, 10

21 U.S.C. § 824(c)………...…………………………….…………..2

21 U.S.C. § 823(g)(l) …………………………………………….…..4

21 U.S.C. § 823(f) ………………………………………….……………….2, 30

21 U.S.C. § 824(a)(4) …………………………………………….…4, 6, 10

21 U.S.C. § 877…………………………………………………….……...……1

## Code of Federal Regulations

5 C.F.R. § 930.204………………………………………………….……12

21 C.F.R. § 1301.44(e)………………………………………….……27

21 C.F.R. § 1306.04(a)…………………………………….…………….…4

21 C.F.R. § 1316.52……………………………………………….………...12, 14-15

21 C.F.R. § 1316.64……………………………………………………….5

**Federal Register Notices**

*Ajay S. Ahuja, M.D.,*84 FR 5479, 5498 (2019)……………………………..……..35

*Barry M. Schultz, M.D.* 76 Fed. Reg. 78,695, 78696 (Dec. 19, 2011)……………..……26

*Christopher Henry Lister, P.A.*, 75 Fed. Reg. 28,068 (May 19, 2010)…………………34

*David A. Ruben*, M.D., 78 Fed. Reg. 38,363, 38,364 (2013)……………………..……27

*Gregory Owen*, M.D., 82 Fed. Reg. 36,905 (Aug. 7, 2017)…………………………32

*Jayam Krishna-Iyer, M.D.*, 74 Fed. Reg. 459, 462 (DEA Jan. 6, 2006)………………...26

*Joilyn L. Wade, P.A.*, 84 Fed. Reg. 45,230 (Aug. 28, 2019)…………………….…34-35

*Jones Total Health Care Pharmacy*, 81 FR 79,188, 79,194 (2016) …………..………27-28

*Kareem Hubbard, M.D.*, 87 Fed. Reg. 21,156, 21,164-65 (2022)………………….....28

*Keith K. Ly, D.O.*, 86 Fed. Reg. 33,746 (June 25, 2021)………………………………33

*Med. Shoppe-Jonesborough*, 73 Fed. Reg. 364 (2008) ………………………….27-28

*Mirielle Lalanne, M.D.*, 78 Fed. Reg. 47,750 (Aug. 6, 2013)……………………...34

*Patrick W. Stodola, M.D.*, 74 Fed. Reg. 20,727, 20,734 (2009)………………..……27

*Randall L. Wolff, M.D.*, 77 Fed. Reg. 5106 (Feb. 1, 2012)……………………….33-34

*Samuel S. Jackson*, 72 Fed. Reg. 23,848, 23,853 (2007)…………………………….28

*Tyson D. Quy, M.D.*, 78 Fed. Reg. 47,412 (Aug. 5, 2013)………………………33

*Wesley Pope, M.D.*, 82 Fed. Reg. 14,944 (Mar. 23, 2017)……………………….32

**United States Constitution**

U.S. Const. art. II. § 2, cl. 2…………………………..……………12, 13, 16, 20, 22

**Pennsylvania Statutes/Codes**

49 Pa. Code § 18.152(a)(2) ……………………………………………………….…4, 5

49 Pa. Code § 18.152(a)(2) …………………………………………………….…5

63 Pa. Cons. Stat.§ 422.13(a), (e), (f). ……………………………………………5

**Court Rules**

Fed. R. Civ. P. 41(a)(1)(A)(i)…………………………………..…..…………..17

Fed. R. App. P. 8(a)(2)(A)…………………………………………………..…36

LAR 28.1(a)(2)……...…………………………………………………………10

# I. STATEMENT OF JURISDICTION

This Court has jurisdiction under 21 U.S.C. § 877 insofar as this is a review of an agency decision and final decision of the Attorney General. Appellant's principal place of business is located within the territorial confines of the Third Circuit Court of Appeals.

## II.    ORDER(S) IN QUESTION

Your Appellant appeals the Order of the Drug enforcement Administration (as shown below) (App. 175) entered on August 19, 2024, by Anne Milgram[1], revoking DEA Certificate of Registration No. MM3329578 issued to Stephen McCarthy P.A. ("McCarthy"), and further denying any pending applications to renew or modify registration as well as denying any other pending application for additional registration in Pennsylvania. (A true and correct copy of the Order from which this appeal is taken is attached hereto as Exhibit "A").

---

[1] Anne Milgram is the Administrator of the DEA, an agency of the United States government within the Department of Justice. The DEA is responsible for regulating the distribution and dispensing of controlled substances. DEA maintains authority under 21 U.S.C. §§ 823(f), 824(a)(4) to revoke or suspend a DEA registration upon finding that a registrant has "committed an act which would render DEA registration inconsistent with the public interest." The Attorney General has delegated this authority to the DEA. *See* <u>United States v. Lippner,</u> 676 F.2d 456, 460 (11th Cir. 1982) (holding that the functions vested in the Attorney General by the Comprehensive Drug Abuse Prevention Act were properly delegated to the DEA). When an existing registration is proposed for revocation, the DEA must serve an "order to show cause" on the registrant and give the registrant an opportunity for a hearing before an Administrative Law Judge ("ALJ") in order to contest the proposed action. *See* 21 U.S.C. § 824(c).

**III.  STANDARD OF REVIEW**

An appellate court will uphold a revocation decision of the U.S. Drug Enforcement Administration (DEA) if substantial evidence supported its factual determinations, its reasoning is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C.S. § 706(2)(A), and its sanction is not a flagrant departure from DEA policy and practice.  St. Croix v. DEA, No. 21-1116, 2022 U.S. App. LEXIS 16183 (D.C. Cir. June 10, 2022) (citations omitted).  Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Deputy Administrator's choice of sanction "is entitled to substantial deference," Chein v. DEA, 533 F.3d 828, (D.C. Cir. 2008)

**IV. CONCISE STATEMENT OF THE CASE**

This appeal raises constitutional challenges to the underlying proceedings against McCarthy, namely as to the ALJ's the removal protections and appointment. This appeal makes and emergency request for relief in the form of a Stay of all underlying agency actions.

**A.    <u>Procedural History</u>.**

On April 21, 2023, the Drug Enforcement Administration ("DEA") issued an Order to Show Cause ("OSC") to Stephen McCarthy, P.A., (Respondent) of Allentown, Pennsylvania. (App. 2-5). The OSC proposed the revocation of Respondent's DEA Certificate of Registration, Control No. MM3329578, alleging that Respondent's continued registration is inconsistent with the public interest. <u>Id</u>. at l (citing 21 U.S.C. §§ 823(g)(l), 824(a)(4)).

In short, the Order to Show Cause (App. 2-5) alleged that Stephen McCarthy, P.A. was prescribing controlled substances between August 24, 2022, and September 20, 2022 (a period of 27 days), and between October 6, 2022, and November 8, 2022 (a period of 33 days) without a valid written agreement with a supervising physician as required by 49 Pa. Code § 18.152. Federal law requires that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Moreover, Pennsylvania

regulations provide that a physician assistant may only perform medical services as approved within a written agreement with a supervising physician; "shall not independently prescribe or dispense drugs"; and may not "[p]rescribe or dispense drugs except as described in the written agreement." 49 Pa. Code § 18.152(a)(2); 63 Pa. Cons. Stat.§ 422.13(a), (e), (f).

A hearing was held before DEA Administrative Law Judge Paul E. Soeffing ("ALJ") on August 31, 2023. (App. 12-119; 121) at which time the Government introduced a preponderance of evidence to prove that McCarthy issued controlled substance prescriptions while practicing without an active written agreement that provided him authority to do so.

On October 27, 2023, the ALJ issued his Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision (hereinafter Recommended Decision or "RD"), which recommended revocation of Respondent's registration. (App. 161-175). In sum, the ALJ found that Stephen McCarthy had not offered any credible evidence on the record to rebut the Government's case for revocation of his registration and Respondent has not demonstrated that he can be entrusted with the responsibility of registration. (App. 174). .

Pursuant to 21 C.F.R. § 1316.64, McCarthy filed his Exceptions to the RD. (App. 152-160). Notwithstanding, the DEA adopted the entirety of the ALJ' s rulings, credibility findings, findings of fact, conclusions of law, sanctions analysis, and

recommended sanction as found in the RD. (App. 161). An Order of the Drug Enforcement Administration was entered on August 19, 2024, by Anne Milgram revoking DEA Certificate of Registration No. MM3329578 issued to Stephen McCarthy P.A., and further denying any pending applications to renew or modify registration as well as denying any other pending application for additional registration in Pennsylvania. (App. 175).

Since entrance of the August 19, 2023, revocation order, the Appellant has now been issued a second Order to Show Cause ("OSC"), dated September 09, 2024, which affords him an opportunity to show cause before the DEA at the DEA Hearing Facility in Arlington, VA as to why the DEA should not revoke his DEA COR, pursuant to 21 U.S.C. § 824(a)(4). (Order to Show Cause is attached hereto as Exhibit "B").

### B.  Narrative History.

Appellant, Stephen McCarthy, is a certified physician assistant licensed to practice in Pennsylvania and has been practicing since October 2014. Respondent was employed at Nulton Diagnostic & Treatment Center (Nulton) between May 2019 and August 14, 2022. Beginning in October 2020 and lasting through August 2022, Respondent was also employed at PA Treatment Center. McCarthy and Dr. Fourcade had a valid supervisory agreement in place from August 22, 2019, to October 7, 2019, while both were employed at Nulton.

McCarthy left Nulton in August of 2022. Thereafter, he issued seventeen (17) prescriptions to patients at a different practice, PA Treatment Center, where Dr. Fourcade did not work and did not have access to the patient's records. The ALJ found that McCarthy was not covered by any supervisory agreement at the time those prescriptions were issued. The Agency further found that Dr. Fourcade never supervised Respondent during that time period. The ALJ noted that there was no regular review of patient records, no reports of McCarthy's activities, and no channels of communication at all between McCarthy and Dr. Fourcade (RD at 25).

In the proceedings below, McCarthy contended that he truly believed that his agreement with Dr. Fourcade remained valid; however, the Agency, in agreement with the ALJ, did not believe that Respondent held a reasonable belief that he could rely on that agreement to issue prescriptions to patients at a practice at which Dr. Fourcade had never worked and after not speaking with Dr. Fourcade for over three years. (RD, at 25). The Agency found that McCarthy issued the relevant prescriptions independently.

Per the Corrective Action Plan ("CAP"), Stephen McCarthy, P.A. has already remedied the issue. (App. 9-10). On November 9, 2022, PA McCarthy submitted a written agreement for supervision under Dr. Richard Paul Paczynski which was accepted on February 1, 2023. In Pennsylvania, Law Act 112 of 1985, Section 13(e.6) indicates all written agreements are considered effective upon submission to

the Board. Therefore, PA McCarthy has been in compliance with all relevant State regulations related to the issuance of prescriptions for controlled substances since November 9, 2022. In fact, there have been no disciplinary proceedings of any kinds instituted by the Commonwealth of Pennsylvania and its agencies. Here, because the DEA made a finding that McCarthy issued the relevant prescriptions independently and since McCarthy only accepted partial responsibility for his actions/errors and omissions, the DEA has imposed the harshest penalty, notwithstanding.

## V.   STATEMENT OF ISSUES FOR REVIEW.

A.   Do the statutory removal restrictions on DEA ALJ's violate Article II making the current proceedings unconstitutional.?

Suggested answer: **YES.**

B.   Does the DEA's Scheme for the Removal of ALJs Violate Article II's Vesting of Executive Power in the President?

Suggested answer: **YES.**

C.   Does the DEA ALJ Appointment Process Violate the Appointments Clause?
Suggested answer: **YES.**

D.   Alternatively, was the Ruling Arbitrary and Capricious?

Suggested answer: **YES.**

## VI. STATEMENT OF RELATED CASES AND PROCEEDINGS.

Pursuant to LAR 28.1(a)(2) the Appellant represents that Appellant has now since been issued as second Order to Show Cause as of September 09, 2024, which affords him an opportunity to show cause before the DEA at the DEA Hearing Facility in Arlington, VA as to why the DEA should not revoke his DEA COR, pursuant to 21 U.S.C. § 824(a)(4). (Order to Show Cause is attached hereto as Exhibit "B"); (App. 176-180).

## VII. SUMMARY OF THE ARGUMENT

The ruling is unconstitutional: (1) the appointment of DEA ALJs violates the Appointments Clause; and (2) The statutory removal restrictions on DEA ALJ's violate Article II making the current proceedings unconstitutional. *See* Jarkesy v. Securities and Exchange Commission, 34 F.4th 446 (5th Cir. May 18, 2022) cert. granted 143 S.Ct. 2688 (June 30, 2023). As a result, the ALJ's Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision should be vacated, and Respondent is entitled to a new proceeding before an ALJ subject to a constitutional removal process. Lucia v. SEC, 141 S. Ct. 1761, 1795 (2021) (Gorsuch, J., concurring).

Alternatively, the Recommended Decision adopted by the DEA Administrator is arbitrary and capricious, and the penalty imposed upon McCarthy is more harsh than necessary and deviates with other similar orders and rulings. McCarthy's misconduct as determined by the Agency does not warrant revocation. Others have done far worse and have received suspensions only. McCarthy is not a threat to the general public. No harm to any individuals was either found, reported or mentioned during the underlying proceeds as a result of the prescriptions PA McCarthy wrote. The ALJ's analysis failed to mention any sort of actual impact of these prescriptions on public health and safety. This revocation would represent an inconsistency in the application of penalties. A much more proportionate response was suitable here.

## VIII. ARGUMENT

### A. THE DRUG ENFORCEMENT ADMINISTRATION'S ALJ APPOINTMENT PROCESS VIOLATES THE APPOINTMENTS <u>CLAUSE</u>.

The Appointments Clause is found in Article II, Section 2, Clause 2 of the U.S. Constitution. It governs the process by which federal officers are appointed and establishes a distinction between different types of officers. DEA ALJs are officers for the purpose of Article II of the U.S. Constitution. DEA ALJs receive their appointments pursuant to the APA. Specifically, the process for the appointment of all ALJs, including the DEA ALJs. Is established in 5 U.S.C. § 3105 which provides that each federal executive agency "shall" appoint as many ALJs as necessary for the agency's administrative proceedings. They hold continuing positions, established by law, in which they exercise significant authority and discretion presiding over DEA administrative hearings and adjudicating adversarial enforcement proceedings. 5 C.F.R. § 930.204 (providing for the "career appointment" of ALJs). *See generally* 21 U.S.C. § 824 (procedures for suspension or revocation); Under the Code of Federal Regulations ("A presiding officer, designated by the Administrator, shall preside over all hearings.") 21 C.F.R. § 1316.52. ("The term presiding officer means an administrative law judge qualified

Since DEA ALJs are executive "officers" for purposes of Article II's Appointments Clause. Under the Appointments Clause, inferior Article II "officers"

such as DEA's ALJs must be appointed either by the President or the Head of their Department, the Attorney General of the United States. U.S. CONST. art. II, § 2, cl. 2. DEA ALJs, however, are appointed by neither. Similar to SEC ALJs, which the Supreme Court in Lucia v. SEC, 585 U.S. 237 (2018), held are inferior officers within the meaning of Article II, DEA ALJs enjoy broad discretion to exercise significant authority with respect to administrative proceedings. Under 5 U.S.C. § 556(c), DEA ALJs may, among other things:

(1)     administer oaths and affirmations;

(2)     issue subpoenas authorized by law;

(3)     rule on offers of proof and receive relevant evidence;

(4)     take depositions or have depositions taken when the ends of justice would be served;

(5)     regulate the course of the hearing;

(6)     hold conferences for the settlement or simplification of the issues by consent of the parties or by the use of alternative means of dispute resolution . . . ;

(7)     inform the parties as to the availability of one or more alternative means of dispute resolution, and encourage use of such methods;

(8)     require the attendance at any conference held . . . ;

(9)     dispose of procedural requests or similar matters;

(10)    make or recommend decisions . . . ; and

(11)   take other action authorized by agency rule consistent with the [APA].

DEA regulations also empower and require DEA ALJs to carry out adjudicative functions in hearings and resolve adversarial proceedings on behalf of DEA. In that regard, Section 1316.52 of Title 21 of the Code of Federal Regulations provides that DEA ALJs are "to conduct a fair hearing, to take all necessary action to avoid delay, and to maintain order." Under the same regulation, DEA ALJs have the additional authority and power to:

(a)   Arrange and change the date, time, and place of hearings . . . and prehearing conferences and issue notice thereof;

(b)   Hold conferences to settle, simplify, or determine the issues in a hearing, or to consider other matters that may aid in the expeditious disposition of the hearing;

(c)   Require parties to state their position in writing with respect to the various issues in the hearing and to exchange such statements with all other parties;

(d)   Sign and issue subpoenas to compel the attendance of witnesses and the production of documents and materials to the extent necessary to conduct administrative hearings pending before him;

(e)   Examine witnesses and direct witnesses to testify;

(f)   Receive, rule on, exclude, or limit evidence;

(g)   Rule on procedural items pending before him;

(h)     Take any action permitted to the presiding officer as authorized by this part or by the provisions of the [APA].

21 C.F.R § 1316.52

In year 2018, the United States Supreme Court in <u>Lucia v. S.E.C.</u>, invalidated the method by which SEC ALJs were appointed, holding that they were inferior officers who must be appointed by the President or Head of Department rather than hired by the agency staff.  585 U.S. 237 (2018).  That decision led multiple federal agencies to examine the validity of past cases that were tried before ALJs and also caused most departments to invalidate their prior selection process and reappoint their existing ALJs.

The United States Supreme Court confirmed that this ALJ appointment process was unconstitutional.  Although the Court's decision specifically addressed the appointment of ALJs for the Securities and Exchange Commission ("SEC"), its reasoning equally applies to the appointment of DEA's ALJs. The Solicitor General explicitly acknowledged this fact in a memorandum addressed to all agency general counsels made public following the Supreme Court's decision in <u>Lucia</u>. In that memorandum, the Solicitor General stated that "SEC ALJs, and other ALJs who exercise similar powers, are inferior officers and must be appointed as such.[2]

---

[2] Office of the Solicitor General, Guidance on Administrative Law Judges after <u>Lucia v. SEC</u> (July 23, 2018) available at https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf.

Here, McCarthy contends that the DEA ALJs were appointed in a manner inconsistent with the ruling in <u>Lucia,</u> meaning that their decision(s), including that of his own license revocation, are constitutionally invalid because the ALJS were not properly appointed as "inferior officers." The decision is unlawful and is subject to challenge based on an improper appointment process.

As alleged by the Plaintiff in <u>Ascent Pharmaceuticals v. Garland</u>. Case 2:23-cv-08260 (E.D.N.Y):

> the DEA ALJs have at all times been appointed by the DEA Administrator. The DEA Administrator selects DEA ALJs from a pool of candidates that submit their applications to OPM. The DEA Chief ALJ reviews those applications and recommends certain ALJ candidates for consideration and appointment by the DEA Administrator.

In such case, the appointment of DEA ALJs by the DEA Administrator violates Article II's Appointments Clause because the DEA Administrator is not the "head" or "principal officer" of an executive department. DEA is not an executive department under Article II of the Constitution. Rather, DEA is an agency within and subordinate to the Department of Justice, an executive department of the United States. The Attorney General of the United States is the head and principal officer of the Department of Justice.

If Administrative Law Judge Paul E. Soeffing, the DEA ALJ presiding over McCarthy's administrative proceeding, was selected from a pool of candidates provided by OPM and appointed by the DEA Administrator upon recommendation

from DEA's Chief ALJ, then the situation would be similarly unconstitutional as alleged in Ascent Pharmaceuticals.[3]

As argued in Ascent and adopted here by McCarthy, as the head of the Department of Justice to which DEA belongs, the power and authority to appoint DEA ALJs rests solely, in addition to the President, with the Attorney General. The DEA Administrator lacks the constitutional power and authority to appoint an ALJ. Neither the President of the United States nor the Attorney General of the United States appoints ALJs to their positions at DEA. Thus, the DEA ALJs are appointed pursuant to a process that violates the Appointments Clause, a fundamental defect in the DEA's administrative enforcement process.

Lucia spoke clearly to the appropriate remedy for an adjudication tainted with an Appointments Clause violation is a new hearing before a properly appointed official. That official cannot be the official who initially heard the case, even if he has by now received (or receives sometime in the future) a constitutional appointment. Id at 251; citing Ryder v. United States, 515 U. S. 177, 182-183 (1995). As a result of the constitutional infraction, PA McCarthy is entitled to a new proceeding before an ALJ appointed pursuant to a process which does not offend the Appointments Clause.

---

[3] Action voluntarily dismissed pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) on July 02, 2024.

**B.** **THE STATUTORY REMOVAL RESTRICTIONS ON DEA ALJs VIOLATE ARTICLE II MAKING THE UNDERLYING PROCEEDINGS UNCONSTITUTIONAL.**

In <u>Jarkesy v. Securities and Exchange Commission</u>, the Fifth Circuit addressed the constitutionality of the Securities and Exchange Commission's (SEC) use of administrative law judges (ALJs) to adjudicate enforcement actions. 34 F.4th 446 (5th Cir. 2022). The <u>Jarkesy</u>[4] case is significant for its challenges to administrative law, particularly regarding the powers and procedures of federal agencies in enforcement actions. The decision, delivered on May 18, 2022, involved three key holdings:

> (1). **The Seventh Amendment Right to Jury Trial.** The court held that the SEC's administrative enforcement proceedings violated George Jarkesy's Seventh Amendment right to a jury trial. The Seventh Amendment preserves the right to a jury in suits at common law where legal rights and remedies are at issue. The Fifth Circuit concluded that the SEC's enforcement action, which involved the imposition of civil penalties for securities fraud, was akin to a traditional common-law fraud case, entitling Jarkesy to a jury trial rather than an administrative hearing before an ALJ.

> (2). **Congress's Delegation of Power to the SEC**. The court ruled that Congress had unconstitutionally delegated legislative power to the SEC by allowing it to choose whether to bring enforcement actions in federal court or before its own ALJs. This unbounded discretion violated the "nondelegation doctrine," which requires that Congress provide an

---

[4] In 2013, the SEC brought an administrative proceeding charging George Jarkesy, Jr., a hedge fund manager, and his firm with securities fraud – an action akin to a suit at common law. Here, the DEA's administrative enforcement regime is limited to determinations of registration status and, as such, likely falls well within the ambit of the "public right

intelligible principle to guide agencies when they are delegated legislative authority. The court found that the SEC's ability to make this choice without sufficient guidance from Congress amounted to an improper delegation of legislative power.

(3). **Removal Protections for Administrative Law Judges.** The court also held that the statutory protections that limit the removal of SEC ALJs violated the Constitution's separation of powers. ALJs in the SEC have dual layers of protection: they can only be removed for cause by the SEC, and the SEC commissioners themselves can only be removed for cause by the President. The court found that these protections unduly insulated ALJs from presidential oversight, violating Article II of the Constitution, which vests executive power in the President and requires that executive branch officers be accountable to the President.

The Fifth Circuit holding is that the insulation of the SEC ALJs from executive supervision with two layers of for-cause removal protections violates the separation of powers[5]. Jarkesy v. Securities and Exchange Commission, 34 F.4th 446 (5th Cir. 2022). The Fifth Circuit denied rehearing *en banc*, 51 F. 4th 644 (2022), and the U.S. Supreme Court granted *certiorari*. 143 S. Ct. 2688, (2023).

---

[5] Article II of the Constitution vests "the executive Power" in the President, and provides the President with the ultimate authority to remove officers—including judicial officers—in the executive branch. Congress may impose modest limitations on that removal power, including certain "for good cause" limitations on the President's removal authority over multimember boards and certain inferior officers. However, in 2010, the Supreme Court imposed a bright-line limit on Congress's power to interfere with the President's removal authority, holding in Free Enterprise Fund v. PCAOB that "dual for-cause limitations" on removal of officers violate the separation of powers. 561 U.S. 477, 492 (2010). In other words, an officer cannot constitutionally be insulated from removal by two layers of for-cause removal protections. The determination of "good cause" must rest in either the President or a Head of Department beholden to the President under Article II. The decision spurred litigation on removal protections in place throughout numerous federal agencies

Ultimately our Supreme Court found that the Seventh Amendment did apply and Jarkesy was required to be tried by a jury. SEC v. Jarkesy, 144 S. Ct. 2117 (2024). Since the answer to the jury trial question resolved the case, the U.S. Supreme Court did not reach the nondelegation or removal issues in Jarkesy. *See e.g.* Space Expl. Techs. Corp. v. NLRB, 2024 U.S. Dist. LEXIS 129439 [FN *1] (W.D. Tex. July 23, 2024) (finding in the context of a preliminary injunction that under current Fifth Circuit law, "there is a substantial likelihood that SpaceX succeeds on the merits with regards to showing that the NLRB ALJs are unconstitutionally protected from removal").

While the Court referenced the removal issue in Lucia, the Court declined to decide it even then. 585 U.S. 237 (2018). Justice Breyer, however, noted in his concurrence that ALJs enjoyed dual-layer removal protections—"just what Free Enterprise Fund interpreted the Constitution to forbid in the case of the Board members." 138 S. Ct. at 2060 (Breyer, J., concurring). Based on the Court's strict approach to removal authority in Federal Housing Finance Agency in Collins v. Yellen, 141 S. Ct. 1761 (2021) and consistent with Justice Breyer's admonition in Lucia, the dual-level removal protection of ALJs, like that of DEA ALJ, must be held unconstitutional.

The DEA's Scheme for the Removal of ALJs Violates Article II's Vesting of Executive Power in the President. The regulatory and administrative framework

20

pursuant to which DEA ALJs may be removed violates Article II because it robs the President and the Attorney General of their constitutional authority and duty to exercise executive power and to faithfully execute the laws of the United States through the oversight of inferior officers such as ALJs, including by removing them without cause.

The Jarkesy decision's ruling on the unconstitutionality of dual-layer removal protections for ALJs must also apply to DEA ALJs. The DEA relies on ALJs to conduct administrative proceedings for the denial, suspension, and revocation of registrations to manufacture, distribute, or dispense controlled substances under the Controlled Substances Act. DEA ALJs—like most, if not all, ALJs employed by the federal government—are subject to the same removal protections that the Fifth Circuit found unconstitutional in Jarkesy. For this reason alone the DEA's current administrative adjudication regime is fatally flawed.

The APA provides that ALJs, including DEA ALJs, may be removed only for good cause as established and determined by the Merit Systems Protection Board ("MSPB"). That statutory restriction renders the President and Attorney General unable to determine "good cause," and thus unable to remove DEA ALJs without approval of the MSPB. Members of the MSPB themselves, however, may not be removed absent good cause. These dual for-cause removal limitations violate Article II under the Supreme Court's ruling in Free Enterprise Fund v. PCAOB, 561 U.S.

477, 492 (2010). This needlessly complex removal structure violates Article II's requirement that inferior executive officers not be protected from removal by their superiors at will, when those superiors are themselves protected from being removed by the President at will.

As recounted above, DEA ALJs are executive officers who exercise significant executive power. Like the SEC ALJs, the DEA ALJs enjoy significant job protections to insulate them from external influence. These protections are too stringent and violate the President's authority under Article II (by preventing adequate executive oversight), which calls into question the independence of DEA ALJs. Nevertheless, (a) DEA ALJs are protected from removal by a statutory "good cause" standard, 5 U.S.C. § 7521(a), and (b) MSPB members empowered to determine the "good cause" standard are themselves protected from removal by an "inefficiency, neglect of duty, or malfeasance in office" standard. 5 U.S.C. §1202(d). This arrangement thwarts the President's Article II executive power and ensures that neither the President nor the Attorney General, as Head of Department, can ensure that the laws are faithfully executed by determining whether good cause exists to remove inferior officers.

In Rowe v. Kijakazi, a U.S. District Court sitting in the Third Circuit recently found that the statutory removal protections afforded to the Commissioner of Social Security violate the separation of powers. 2023 U.S. Dist. LEXIS 57593 (M.D. Pa.

Mar. 31, 2023) citing <u>Stamm v. Kijakazi</u>, 577 F. Supp. 3d. 358, 366 (M.D. Pa. 2021).

However, the <u>Rowe</u> court held:

> it does not follow that this unconstitutional removal restriction requires the court to set aside an unfavorable disability benefits determination by an ALJ. For one thing, a constitutionally defective statutory removal provision ***does not render the Commissioner's appointment invalid***, and thus it does not automatically void the ALJ's actions under <u>Stamm v. Kijakazi</u>, 577 F. Supp. 3d 358, 366-367 (M.D. Pa. 2021).

As the Supreme Court explained in <u>Collins</u>, all the officers who headed the FHFA during the time in question ***were properly appointed.*** Although the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, the <u>Collins</u> court found no reason to regard any of the actions taken by the FHFA in relation to the [administrative action at issue] as void. <u>Collins</u>, 141 S. Ct. at 1787. The <u>Rowe</u> court agreed and held: "[w]hile the removal-limitation clause in § 902(a)(3) violates the separation of powers, it does not independently require the court to reverse an ALJ's decision absent a showing of compensable harm, which has not been made in this case."

Here, and as argued at length above, DEA's ALJ appointment process violates the appointments clause which renders the proceedings against McCarthy unconstitutional. *C.f.* <u>Reilly v. O'Malley</u>, 2024 U.S. Dist. LEXIS 13176 (E.D. Pa. Jan. 25, 2024) (finding that Reilly failed to make a showing of compensable harm in

part because Reilly failed to allege that the ALJ at issue was improperly appointed). Your Appellant makes no concession that ALJ Soeffing or any other presently sitting DEA ALJ's have been properly appointed. Given this circumstance, the dual challenge brought by McCarthy is broader than in <u>Rowe</u> and the remedy afforded to McCarthy should also be broader; namely voiding ALJ Soeffing's actions which are *ultra vires*.

Notwithstanding, now having his COR revoked Appellant cannot work in his profession. He faces yet another unconstitutional proceeding which could result in further penalty. Appellant, therefore, can satisfy the showing of compensable harm even if this appeal solely, assuming arguendo, only addressed the constitutionality of removal protections.

As a result of the constitutional infraction, PA McCarthy is entitled to a new proceeding before an ALJ subject to a constitutional removal process. This position was also endorsed by Justice Gorsuch in a concurrence in <u>Collins</u> by stating the Court should "set aside the Director's *ultra vires* actions as contrary to constitutional rights[.]"141 S. Ct. at 1795 (Gorsuch, J., concurring).

The Government is likely to contend here, as it did in a footnote to the Revocation Order (App. 174-175), that:

> the SEC Commissioners may only be removed by the President for good cause," and thus there were "two layers of insulation" that impede[d] the President's power to remove" the SEC's ALJs. By contrast, there is no doubt

that the President may remove the Attorney General at will. Accordingly, <u>Jarkesy</u> can and should be distinguished from the instant situation with respect to the DEA's ALJs., and the Agency finds [McCarthy's] Exception to be unpersuasive.

<u>Id</u>. at [FN *19]

Importantly, however, for DEA registrants, because the ALJ removal protections are based in statute, the DEA has no unilateral means to correct the removal flaw confronting its ALJs.

### C. THE RECOMMENDED DECISION OF THE ALJ (ADOPTED BY THE DEA) IS ARBITRARY AND CAPRICIOUS AND A <u>RESULT OF AN ABUSE OF DISCRETION</u>.

Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Deputy Administrator's choice of sanction "is entitled to substantial deference," <u>Chein v. DEA</u>, 533 F.3d 828, 835 (D.C. Cir. 2008), and we will set it aside only if her decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Ordinarily, the mere unevenness in the application of a sanction will not render its application in a particular case "unwarranted in law." If the revocation represents a flagrant departure from DEA policy and practice, however, and if the departure is not only unexplained, but entirely unrecognized in the [Deputy Administrator's] decision, the agency's sanction cannot withstand abuse of discretion

review.  <u>Chein</u>, 533 F.3d at 835; <u>St. Croix v. DEA</u>, No. 21-1116, 2022 U.S. App. LEXIS 16183 (D.C. Cir. June 10, 2022) (citations omitted).

In the Recommended Decision the ALJ remarked that he found McCarthy's testimony to be genuine, but with one "glaring inconsistency"[6]. (App. 132). The ALJ remarked:

> As the Respondent in this case, Mr. McCarthy also has a significant personal interest[7] in the outcome of these proceedings. Based on this identified inconsistency and the Respondent's personal interest, I will give his testimony somewhat reduced weight, especially where it is in conflict with the testimony of other witnesses and evidence presented during the hearing.

<u>Id</u>. at 132-33.

In, <u>Jayam Krishna-Iyer, M.D.</u>, 74 Fed. Reg. 459, 462 (Jan. 6, 2006) the Deputy Administrator noted that if "some isolated decisions of this Agency may suggest that a practitioner who committed only a few acts of diversion was entitled to regain his

---

[6] Notwithstanding Respondent's testimony the ALJ effectively reasoned that errors in some of the prescriptions at issue may, or may not have, been entirely the result of "failure to notice an auto-populate setting".  Per the ALJ this warranted a reduction in the weight of McCarthy's testimonial credibility.

[7] All respondents have a significant interest in their COR. Judge Wendy Beetlestone in <u>Rizvi v. Kovach</u>, 2021 U.S. Dist. LEXIS 154412 (E.D. Pa. Aug. 16, 2021) held that "in at least one decision, the DEA itself has recognized that a property interest inheres in a DEA certificate of registration." *See* <u>Barry M. Schultz, M.D., Decision and Order</u>, 76 Fed. Reg. 78,695, 78,696 (Dec. 19, 2011) ("The Respondent has a constitutionally protected property interest in his DEA registration.").  To permit a respondent's property interest to affect and automatically lessen the weight and/or credibility of respondent's testimony is an abuse of discretion. *C.f.* <u>Hoxie v. DEA</u>, 419 F.3d 477, 482-483 (6th Cir. 2005)) (holding DEA may take an adverse inference from physician's failure to testify during proceedings involving revocation of his controlled substances registration).

registration even without having to accept responsibility for his misconduct, the great weight of the Agency's decisions are to the contrary." <u>MacKay v. DEA</u>, 664 F.3d 808, 819 (10th Cir. 2011). Because the diversion of controlled substances poses a "grave and increasing harm to public health and safety," the Deputy Administrator has made clear that even where only a few acts of diversion have been committed, "this Agency will not grant or continue the practitioner's registration unless he accepts responsibility for his misconduct." <u>Id</u>.

In the adjudication of a revocation of a DEA registration, the DEA has the burden of proving that the requirements for such revocation or suspension are satisfied. 21 C.F.R. § 1301.44(e). (App. 134). Where the Government has sustained its burden and made its *prima facie* case, a respondent must both accept responsibility for his actions and demonstrate that he will not engage in future misconduct. <u>Patrick W. Stodola, M.D.</u>, 74 Fed. Reg. 20,727, 20,734 (2009). <u>Id</u>. Acceptance of responsibility and remedial measures are assessed in the context of the "egregiousness of the violations and the [DEA's] interest in deterring similar misconduct by [the] Respondent in the future as well as on the part of others." <u>David A. Ruben, M.D.</u>, 78 Fed. Reg. 38,363, 38,364 (2013). <u>Id</u>. With the Government's *prima facie* burden having been met, an unequivocal acceptance of responsibility stands as a condition precedent for the Respondent to prevail. <u>Jones Total Health Care Pharmacy, L.L.C. & SND Health Care, L.L.C.</u>, 81 Fed. Reg. 79,188, 79,201

(2016). (App. 146). Accordingly, a Respondent must "present[] sufficient mitigating evidence to assure the Administrator that [he] can be entrusted with the responsibility carried by such a registration." Med. Shoppe-Jonesborough, 73 Fed. Reg. at 387 (quoting Samuel S. Jackson, 72 Fed. Reg. 23,848, 23,853 (2007)).

As past performance is the best predictor of future performance, the DEA has repeatedly held that where an applicant or registrant has committed acts inconsistent with the public interest, the applicant or registrant must accept responsibility for his actions and demonstrate that he will not engage in future misconduct. ALRA Labs, Inc. v. DEA, 54 F.3d 450, 452 (7th Cir. 1995). "The central issue is whether, based on the evidence of record, including a Respondent's established misdeeds, the Agency can trust a Respondent with the authority to handle controlled substances." (App. 147). "[T]o be granted a registration when grounds for denial exist, an [a]pplicant must convince the Administrator that . . . his misconduct will not reoccur and that he can be entrusted with registration." Kareem Hubbard, M.D., 87 Fed. Reg. 21,156, 21,164-65 (2022).

Here, ALJ Paul Soeffing found that that McCarthy, though admitting fault in some things, equivocated as to his acceptance of total responsibility: "[t]herefore, I do not find that the Respondent has demonstrated an 'unequivocal acceptance of responsibility' for his actions"; citing Jones Total Health Care Pharmacy, 81 Fed. Reg. at 79,201-02.44. The ALJ did not take note that McCarthy accepted some

responsibility. When discussing the inclusion of "Dr. Mitchell" on prescriptions issued by the Respondent during the relevant time-period (and nearly one year after the termination of the Respondent's active agreement with Dr. Mitchell), Respondent stated that "it was an error on [his] part" not to make a change to auto-correct settings. (App. 147-148) The Respondent additionally acknowledged that his agreement with Dr. Fourcade was inactivated in October of 2019, based on the termination letter introduced by the Government. <u>Id</u>.

There is a general practice of the DEA which reserves revocation for only the most egregious cases and considers alternative sanctions where there is evidence of good-faith efforts to comply and correct past misconduct. McCarthy's misconduct, which he characterizes as a time-limited failure to maintain a supervisory agreement based on a misunderstanding, is less severe than the violations at issue in many of these cases, which involved direct harm to patients and intentional disregard of prescribing standards. Moreover, McCarthy partially accepted responsibility. McCarthy has acknowledged error on his part and plainly admitted that his agreement with Dr. Fourcade was not active in October of 2019. (App. 130).

By way of example, in <u>St. Croix v. DEA</u>, No. 21-1116, 2022 U.S. App. LEXIS 16183 (D.C. Cir. June 10, 2022), the Appellate court concluded pursuant to 21 U.S.C.S. § 877 that the DEA acted reasonably when revoking a doctor's registration to dispense controlled substances and denied all pending applications for renewal or

modification of her registration. In view of DEA's thoroughly detailed factual findings, the revocation of Dr. St. Croix's registration was not arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. Substantial evidence established pursuant to 21 U.S.C.S. § 823(f), that the doctor had violated state and federal laws as well as the terms of her memorandum of agreement with the DEA concerning her prescription of controlled substances.

In the proceedings against Dr. St. Croix, the DEA found that Dr. St. Croix: (1) failed to maintain medical records of her prescriptions of controlled substances; (2) prescribed controlled substances for no legitimate medical purposes; (3) stored controlled substances at an unregistered location; (4) failed to provide effective controls to guard against theft or diversion of these substances; (5) provided misleading information to investigating agents; and (6) violated the terms of her pre-existing MOA with DEA by failing to provide monthly drug logs documenting all such prescriptions. The DEA reasoned that it would be "'inconsistent with the public interest' for [Dr. St. Croix] to have a registration." It explained that Dr. St. Croix's violations go "to the heart of" the CSA's goals, and that she failed to take full responsibility for her actions.

McCarthy's misconduct is not of a severity that warrants the extreme measure of revocation. His actions did not result in harm to patients or the public. There was no allegation or showing that McCarthy: (1) failed to maintain medical records of

his prescriptions of controlled substances; (2) prescribed controlled substances for no legitimate medical purposes; (3) stored controlled substances at an unregistered location; (4) failed to provide effective controls to guard against theft or diversion of these substances; or (5) provided misleading information to investigating agents. Unlike in <u>St. Croix</u>, here there was no allegation nor showing that McCarthy was convicted for violating state laws concerning her prescription of controlled substances; nor was there any showing of the involvement of Pennsylvania law enforcement agencies or disciplinary bodies.

There was no showing that McCarthy's errors and omissions were motivated by malicious intent or personal gain. A much more proportionate response was warranted in this case. McCarthy had already taken steps to rectify the situation, specifically finding a new supervising physician, Dr. Richard Paul Paczynski, per written agreement activated on February 01, 2023. *See* (App. 9, 130). This proactive and rehabilitative measure should be a reason to consider a lesser penalty. Alternative sanctions would be more proportionate and constructive, such as a probationary period, additional oversight, or mandatory training. The revoking PA McCarthy's COR is not in the public interest insofar as he provides critical, specialized psychiatric care which is not easily replaceable.

The following cases show an overall pattern of DEA imposing lesser sanctions in cases involving more egregious prescribing and registration violations.

Revocation of Stephen McCarthy's COR was an excessive and unwarranted departure from agency precedent. The cumulative weight of prior decisions shows the DEA failed to engage in reasoned decision-making here, and failed to consider less drastic alternatives that would have been consistent with its handling of analogous cases in the past as show below:

1. **Gregory Owen, M.D., 82 Fed. Reg. 36,905 (Aug. 7, 2017).**

   DEA issued an order to show cause (OSC) seeking to revoke a physician's registration based on allegations of issuing prescriptions without a legitimate medical purpose and outside the usual course of professional practice. During the DEA proceedings, the state medical board investigated the physician and imposed probationary terms and conditions on his license.

   The DEA Administrator gave deference to the state board's action, finding that it reflected a determination that the physician could still be entrusted with a medical license and weighed against a finding that his continued registration was inconsistent with the public interest. The Administrator continued the physician's registration subject to conditions, rather than revoking it, based in part on the state board's action.

2. **Wesley Pope, M.D., 82 Fed. Reg. 14,944 (Mar. 23, 2017).**

   Physician was accused of issuing over 100 prescriptions for controlled substances to 10 patients without a legitimate medical purpose and outside the usual course of professional practice. The prescriptions included high doses of opioids and other controlled substances that were diverted and abused by patients. Despite these serious allegations, the ALJ found that revocation was not warranted and recommended that the physician's registration be continued subject to a 2-year probationary

period and various monitoring and reporting requirements. The Acting Administrator adopted the ALJ's recommended sanction, emphasizing the physician's acceptance of responsibility, implementation of remedial measures, and overall "positive prescribing practices" beyond the violations at issue.

**3. Tyson D. Quy, M.D., 78 Fed. Reg. 47,412 (Aug. 5, 2013).**

Physician was found to have committed numerous violations, including prescribing controlled substances to patients without conducting proper examinations, documenting justifications, or resolving red flags of abuse and diversion. He also post-dated prescriptions and failed to maintain accurate records.

Despite these violations, the Deputy Administrator continued the physician's registration subject to a 2-year suspension followed by 3 years of probation. The Deputy Administrator cited various remedial measures undertaken by the physician and his general acceptance of responsibility as factors justifying a more lenient sanction than revocation.

**4. Keith K. Ly, D.O., 86 Fed. Reg. 33,746 (June 25, 2021).**

Physician committed numerous recordkeeping violations, including failing to maintain inventories, dispensing logs, and receipt records for controlled substances. He also pre-signed prescription pads and allowed office staff to issue prescriptions to patients using his signature. Despite these serious deficiencies, the Acting Administrator imposed a sanction of a 1-year suspension followed by a 4-year probationary period. The Acting Administrator found that the physician's acceptance of responsibility and remedial measures mitigated against revocation.

**5. Randall L. Wolff, M.D., 77 Fed. Reg. 5106 (Feb. 1, 2012).**

Physician prescribed controlled substances to individuals he had never personally examined or diagnosed, relying solely on internet questionnaires and telephone consultations. He also allowed non-medical staff to use pre-signed prescription pads to issue controlled substance prescriptions. Despite the ALJ's recommendation of revocation, the Administrator instead imposed a 1-year suspension followed by 5 years of probation. The Administrator cited the physician's efforts to reform his practice and the "socially beneficial" nature of his work in a medically underserved area as factors justifying a lesser sanction.

### 6. Mirielle Lalanne, M.D., 78 Fed. Reg. 47,750 (Aug. 6, 2013).

Physician issued prescriptions for controlled substances without a proper medical purpose, failed to conduct adequate patient evaluations, and ignored red flags of diversion. She also permitted an unlicensed individual to use her DEA registration number to call in prescriptions. Despite these violations, the Deputy Administrator imposed a 2-year suspension followed by 2 years of probation. The Deputy Administrator found that the physician had accepted responsibility and demonstrated a "commitment to regaining the trust of the Agency," which mitigated against revocation.

### 7. Christopher Henry Lister, P.A., 75 Fed. Reg. 28,068 (May 19, 2010).

Physician Assistant prescribed controlled substances on several occasions using an expired DEA registration number. He also failed to include his PA designation on some prescriptions and did not always include the name of his supervising physician. Despite these violations, the Deputy Administrator imposed only a 6-month suspension of his registration. The Deputy Administrator found that the physician assistant had "learned from his past misconduct" and was unlikely to repeat the violations, which weighed in favor of a more lenient sanction.

## 8. Joilyn L. Wade, P.A., 84 Fed. Reg. 45,230 (Aug. 28, 2019).

> Physician assistant prescribed controlled substances without being registered in the state where she practiced. She also failed to maintain complete and accurate records of her controlled substance prescriptions. The ALJ found that revocation was not warranted and recommended a 3-year probationary period. The ALJ cited the physician assistant's acceptance of responsibility and remedial measures as factors mitigating against revocation. The Acting Administrator agreed and imposed the recommended sanction of probation.

These aforementioned cases involve a range of violations by physicians and physician assistants, to include improper prescribing practices, recordkeeping failures, and registration issues. In each case, the DEA ultimately imposed a sanction short of revocation, such as suspension or probation, based on mitigating factors like the registrant's acceptance of responsibility, severity of the offenses, efforts, and overall positive professional conduct.

The fact that these registrants, including other physician assistants, were able to retain their DEA registrations subject to conditions, while PA McCarthy had his registration revoked, shows that the DEA acted arbitrarily and capriciously by failing to consider lesser sanctions and deviating from its prior practice without adequate explanation. The apparent inconsistency in outcomes in terms of penalty is demonstrative of a lack of reasoned decision-making. Again, there was no showing of diversion. There has been no showing of harm or criminality. The penalty is disproportionate to the offenses; especially given the brief time period (60) days,

when the infractions occurred. According to the analysis of the ALJ here: taking some responsibility is just not good enough. When a registrant fails to make the threshold showing of acceptance of responsibility, the Agency need not address the registrant's remedial measures. <u>Ajay S. Ahuja, M.D.</u>,84 FR 5479, 5498 n.33 (2019). Remedial actions are invisible in the absence of a total, testimonial acceptance of responsibility. McCarthy contends this is a capricious standard as applied.

The revocation of Appellant's COR will destroy his ability to practice his profession, terminate his career, and will cause needless personal and financial ruin. As demonstrated, similar or even more severe violations have resulted in lesser punishments, such as fines, reprimands, or temporary suspensions. This revocation would represent an inconsistency in the application of penalties as applied to McCarthy.

## IX. APPELLANT IS ENTITLED TO A STAY PENDING APPEAL.

The United States Supreme Court has found that an ALJ appointment process nearly identical to that used by DEA is unconstitutional. DEA, however, has done nothing to conform its ALJ appointment process to constitutional requirements. Moreover, statutory restrictions on an ALJ's removal violate the President's Article II executive power. The DEA nonetheless seeks to compel McCarthy to participate in another unconstitutional DEA administrative proceeding by way of its Order to Show Cause dated September 09, 2024.

McCarthy seeks a Stay Pending Appeal pursuant to FRAP 8(a)(2)(A)) to prevent the irreparable harm he will suffer if: (a) the revocation of his COR as ordered by DEA Administrator Ann Milgram on August 19, 2024 is not held in abeyance; and (b) he is subjected to yet another unconstitutional proceeding.

Under the Supreme Court's decision earlier this year in <u>Axon</u>, McCarthy is entitled to seek relief in this Court now to address its constitutional challenges to avoid compounding the "here-and-now injury" from being subjected to this illegitimate proceeding. The here and now injury is that type of harm that is "impossible to remedy once the proceeding is over, which is when appellate review kicks in." 598 U.S. at 192.

This Court has the power to limit the enlargement of the injury by granting a Stay. Your Appellant, therefore, respectfully requests that his "Emergency Motion for Stay of Agency Decision and Actions Pending Appeal", concomitantly filed with this Brief be granted forthwith.

**X. CONCLUSION**

Here, McCarthy's dual constitutional challenges as to the appointment *and* removal restrictions of DEA ALJS plausibly suggests that the process associated with his COR revocation was constitutionally deficient and will remain deficient with respect to the pending OSC. (App. 176-180). McCarthy is entitled to a new, fair and impartial hearing and a stay pending appeal as requested.

Respectfully submitted,

**THE LAW OFFICES OF
DANIEL A. PALLEN, P.L.L.C.**

Daniel A. Pallen, Esquire
PA Attorney ID: 207001
114 West Front Street
Media, PA 19063
(484) 550-7542
(484) 550-7532 *fax*

# **IDENTICAL COMPLIANCE CERTIFICATION**

I hereby certify that the E-Brief and Hard Copies of the same (if any) are identical.

                                      _____

                                      Daniel. A. Pallen, Esquire

# CERTIFICATION OF BAR MEMBERSHIP

I, Daniel A. Pallen, hereby certify that your undersigned, counsel for the Appellant, Stephen McCarthy, is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Daniel. A. Pallen, Esquire

<h1 style="text-align:center"><u>CERTIFICATE OF COMPLIANCE</u></h1>

1.     This Appellate Brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d) because it includes fewer than 13,000 words, including the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f); and

2.     This Appellate Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 Version 2402: (March 12, 2024) in 14-point Times New Roman Font; and

3.     This Appellate Brief complies with this Court's Rule 31.1(c) because the document has been scanned with McAfee Endpoint Security Version 10.6 and is free of viruses.

Daniel A. Pallen, Esquire

<u>**CERTIFICATE OF SERVICE**</u>

I, Daniel A. Pallen, Esquire, counsel for Appellant, Stephen McCarthy, do hereby certify that on this, the 30th day of September 2024, that I did electronically file and serve a true and correct copy of the foregoing Appellant's Brief and Appendix with the Clerk of Court for the United Sates Court of Appeals for the Third Circuit. Service upon interested parties and counsel was made *via* the Third Circuit Court of Appeals CM/ECF system and/or first class mail (postage pre-paid).

Jennifer L. Holsclaw, Esquire
Office of Chief Counsel - Diversion Section
8701 Morrissette Drive Springfield, VA 22152
Jennifer.L.Holsclaw@dea.gov
DEA.Registration.Litigation@dea.gov

Dated: 09/30/2024                              By: _____
                                                            Daniel A. Pallen



EXHIBIT A

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

Docket No. 23-40
STEPHEN MCCARTHY, P.A.
DECISION AND ORDER

On April 21, 2023, the Drug Enforcement Administration (DEA or Government) issued an Order to Show Cause (OSC) to Stephen McCarthy, P.A., (Respondent) of Allentown, Pennsylvania. OSC, at 1, 4. The OSC proposed the revocation of Respondent's DEA Certificate of Registration, Control No. MM3329578, alleging that Respondent's continued registration is inconsistent with the public interest. *Id.* at 1 (citing 21 U.S.C. §§ 823(g)(1), 824(a)(4)).

A hearing was held before DEA Administrative Law Judge Paul E. Soeffing (the ALJ), who, on October 27, 2023, issued his Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision (Recommended Decision or RD), which recommended revocation of Respondent's registration. RD, at 30. Following the issuance of the RD, Respondent filed his Exceptions to the Recommended Decision (Exceptions).[1] Having reviewed the entire record, the Agency adopts and hereby incorporates by reference the entirety of the ALJ's rulings, credibility findings,[2] findings of fact, conclusions of law, sanctions analysis, and recommended sanction as

---

[1] The Agency has reviewed and considered Respondent's exceptions and addresses them herein, but ultimately agrees with the ALJ's recommendation.

[2] The Agency adopts the ALJ's summary of each of the witnesses' testimonies as well as the ALJ's assessment of each of the witnesses' credibility. *See* RD, at 2-13. The Agency agrees with the ALJ that the testimony from the DEA Diversion Investigator (DI), which was primarily focused on the introduction of the Government's documentary evidence and the DI's involvement with the case, was generally consistent without indication of any animosity towards Respondent and thus was fully credible and warranted substantial weight. *Id.* at 5. The Agency also agrees with the ALJ that the testimony from Dr. F., which was focused on Dr. F.'s role as a supervisory physician, her written supervisory agreement with Respondent, and her experience with the Pennsylvania Licensing System, was genuine and internally consistent and thus was fully credible and warranted substantial weight. *Id.* at 8. Finally, the Agency agrees with the ALJ that the testimony from Respondent, which was focused on his experience as a physician assistant operating under supervising agreements, his understanding regarding his written agreement with Dr. F., and his descriptions of the prescriptions he issued during the relevant time period, appeared genuine but for one major inconsistency regarding his use of auto-populated settings identifying Dr. M. as the supervising physician during the relevant time. *Id.* at 12; *see also infra* III. Based on this inconsistency and Respondent's

1

found in the RD.

## I.   FINDINGS OF FACT

### 1. Respondent's Written Agreement with Dr. F.

Respondent is a certified physician assistant licensed to practice in Pennsylvania and has been practicing since October 2014. RD, at 8; Tr. 56. Respondent was employed at Nulton Diagnostic & Treatment Center (Nulton) between May 2019 and August 14, 2022. RD, at 8; Tr. 57. Beginning in October 2020 and lasting through August 2022, Respondent was also employed at PA Treatment Center. RD, at 8; Tr. 57-58. Dr. F. is a psychiatrist licensed to practice in Pennsylvania who began working for Nulton in 2019. RD, at 5; Tr. 40. Dr. F. did not work at PA Treatment Center. Tr. 37-38.

Dr. F. met Respondent in approximately the spring of 2019 while she was considering a job at Nulton. RD, at 6; Tr. 40-41. Respondent testified that this initial meeting was the only time he ever spoke to Dr. F. RD, at 10, Tr. 9. Dr. F. testified that after the initial meeting, she entered into a written agreement with Respondent wherein Dr. F. served as Respondent's supervising physician. RD, at 6; Tr. 41. However, shortly after Dr. F. began work at Nulton, her supervisory capacities were allocated elsewhere, so she and Respondent never actually engaged in a supervisory relationship even during the pendency of the agreement. RD, at 7; Tr. 46. Dr. F. testified that the written agreement lasted from August 22, 2019, to October 7, 2019. RD, at 6; Tr. 41, 46. Respondent testified that while working at Nulton, he had supervising agreements with various physicians, including Dr. F. RD, at 8; Tr. 58.

---

personal interest in the outcome of the proceedings, the ALJ found, and the Agency agrees, that Respondent's testimony warranted reduced weight, especially where in conflict with the testimony of other witnesses and evidence presented during the hearing. *Id.* at 12-13.

Dr. F. testified that generally, a written agreement is made between a board-certified physician and a physician assistant and that these agreements have two major components: the first, "to delegate the medical services that the [physician assistant] should perform," and the second, "that the physician should be supervising the [physician assistant] to carry out those medical services or those medical duties." RD, at 6; Tr. 41.[3] Dr. F. testified that when she is supervising a physician's assistant, she "make[s] it a point to sign off on every note individually, to at least scan the notes for consistency."[4] RD, at 6; Tr. 41-42. Dr. F. also testified that once a year, she does "a deep dive in each individual case to make sure that it's moving correctly." RD, at 6; Tr. 42. Dr. F. explained that any time one of her supervisees wants to make any major medical changes, the supervisee will contact her and they will either text or have a phone conversation about it. RD, at 6; Tr. 42. Dr. F. further explained that her "fingers are closely laced into every case that's supervised under [her] name" and she meets in "weekly face-to-face telecommunication supervision, where [she] bring[s] up individual challenging cases" with her supervisees. RD, at 6; Tr. 42. Despite her agreement with Respondent, Dr. F. never actually functioned as a supervisor for Respondent. RD, at 6-7; Tr. 43.

Respondent testified that "under Pennsylvania law, [his] duties as a physician assistant are to evaluate, treat, and provide care to patients under the supervision of a doctor." RD, at 8; Tr. 56-57.[5] Respondent testified that his "role in [a] written agreement is defined by the written

---

[3] Respondent similarly testified that a written agreement requires that both the physician and physician assistant sign a document agreeing to the terms of supervision; the physician must also "specify in very basic terms what the duties of the physician assistant will be under the agreement." RD, at 9; Tr. 59.

[4] Dr. F. testified that "notes" are legally required records based on patient encounters with the supervising physician or the physician assistant and are expected to contain basic information regarding the patient's visit. RD, at 6 n.18; Tr. 42-43.

[5] Respondent asserted, however, that a supervising physician "is not required by law" to review Respondent's charts and treatment because Respondent has been "practicing for more than a year." RD, at 9 n.24; Tr. 84. Respondent provided no citation to Pennsylvania law to support this assertion, nor does the Agency find any support for this assertion in Pennsylvania regulations. Such lack of support detracts from Respondent's overall credibility as well as the weight afforded Respondent's statement.

3

agreement itself." RD, at 9; Tr. 82. According to Respondent, in his experience, he has an "independent caseload of patients" wherein he has "made decisions regarding their treatment without input from the physician, and . . . consulted the physician only in times of question, in times [] when [he is] uncertain about how to proceed with treatment or if [he has] questions about managing a patient." RD, at 9; Tr. 83. In this case, however, it is important to note that Pennsylvania regulations provide that a physician assistant "shall not independently prescribe or dispense drugs." 63 Pa. Cons. Stat. § 422.13(f); *see also* 49 Pa. Code § 18.152(a)(2).

Respondent asserted that "the supervising physician's role is to provide oversight of [his] treatment . . . [but] what that degree of oversight is[,] is dictated by the written agreement itself." RD, at 9; Tr. 83. Respondent testified that "in almost all the written agreements [he has] participated in, the physicians were very hands off and only communicated with [him] if there was a particular issue." RD, at 9; Tr. 83-84.[6]

Respondent testified that even when his written agreement with Dr. F. was active (according to the Government's documentary evidence), he "never consulted with her." RD, at 10; Tr. 94. Dr. F. also testified that she did not talk or consult with Respondent regarding patient care or any other matters in 2022. RD, at 7; Tr. 45. Not only did Respondent not consult with Dr. F., he testified that he had no conversations with Dr. F. at all during the course of their agreement. RD, at 10 n.27; Tr. 95. Even so, Respondent claimed that his non-existent relationship with Dr. F. was "not that unusual," and that he has had "supervising physicians [he has] never met or spoken to." Tr. 96. Respondent did not testify regarding whether or not he

---

[6] Respondent noted that in one instance, he never even met the supervising physician, never reviewed a case with the supervising physician, never did a case review, and never spoke with the supervising physician. RD, at 9 n.24; Tr. 84. Respondent reiterated that it was not unusual for him to have little communication with his supervising physician and that he has supervising physicians whom he has never met or spoken to. RD, at 9 n.24; Tr. 96-97.

4

had written controlled substance prescriptions under the authority of those supervising physicians he had never spoken to.

### 2. Notification of Termination of Respondent's Agreement with Dr. F.

It is undisputed that the agreement between Respondent and Dr. F. ended in October 2019. RD, at 10; Tr. 85-86. However, Respondent testified that he was never notified that the agreement was terminated, so he believed that from August 2022 through November 2022, he was still covered under the agreement with Dr. F. RD, at 8, 10; Tr. 58, 86. Respondent testified that he believed the agreement remained in place even after he left Nulton in August 2022, because he believed that "[a]ccording to the law, the agreement does not end when your employment ends." Tr. 98.[7]

Dr. F. testified that she did not contact Respondent regarding inactivation of their agreement and did not discuss her receipt of the termination letter from the Board with Respondent. RD, at 7; Tr. 46-48.

The Agency notes that the October 8, 2019 termination letter indicates that Respondent was provided a copy of the letter. *See* GX 14. However, in support of his belief that the agreement between himself and Dr. F. remained in effect, Respondent produced a 2023 printout from the Pennsylvania Licensing System (PALS) website that includes the "association start date" for the supervisory agreement between Respondent and Dr. F., but no "association end date." Respondent Exhibit 2, at 5. Testimony from both parties support a finding that the PALS system could contain inaccuracies. RD, at 7, 11, 23; Tr. 51, 98-99.

---

[7] Respondent again provided no citation to Pennsylvania law to support this assertion, nor does the Agency find any support for this assertion in the Pennsylvania regulations. *See* 49 Pa. Code § 18.172 ("The physician assistant is required to notify the Board, in writing, of a change in . . . employment . . . [and] provide the Board with the new . . . address of employment and name of registered supervising physician."). Once more, as well as in other instances in this Decision, such lack of support detracts from Respondent's overall credibility as well as the weight afforded Respondent's statement.

### 3. Respondent's Improper Prescribing

It is undisputed that between August 24, 2022, and September 20, 2022, and between October 6, 2022, and November 8, 2022, Respondent issued approximately seventeen (17) prescriptions for controlled substances to patients[8] without being party to a written agreement with a supervising physician. RD, at 21; Tr. 71-81; GX 8, 12. However, Respondent testified that when he prescribed the relevant controlled substances, he did so while believing that he was operating under a valid written agreement with Dr. F. RD, at 11; Tr. 81. None of the patients who received the 17 prescriptions were treated at Nulton; they were treated at the PA Treatment Center where Dr. F. had never been employed. RD, at 23; Tr. 72, 75, 77-79, 104. Further, on cross-examination, Respondent acknowledged that Dr. F.'s name did not appear on the relevant prescriptions and that the "supervising prescriber" section of the prescriptions was blank.[9] RD, at 11-12, 25; Tr. 88-91; GX 8.[10]

Federal law requires that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Moreover, Pennsylvania regulations provide that a physician assistant may only perform medical services as approved within a written agreement with a supervising physician; "shall not independently prescribe or dispense drugs"; and may not "[p]rescribe or dispense drugs except as described in the written agreement." 49 Pa. Code § 18.152(a)(2); 63 Pa. Cons. Stat. § 422.13(a), (e), (f).

---

[8] Respondent testified about the multiple patients whom he treated during his time at the PA Treatment Center as well as the risks of harm associated with abrupt cessation of medication, particularly for patients diagnosed with opioid disorders. RD, at 11; Tr. 71-81.

[9] According to Respondent, a pharmacy would typically fill out the information on the prescription identifying the supervising prescriber, and it was thus his practice to leave the supervising prescriber section blank. RD, at 12; Tr. 91, 93-94.

[10] The ALJ noted that the note portion of some of the prescriptions indicates that the supervising physician was Dr. M., whose agreement with Respondent terminated in December 2021. RD, at 25; Tr. 88-90, 92; RX 1, at 5.

6

Here, the Agency finds that Respondent and Dr. F. had a valid supervisory agreement in place from August 22, 2019, to October 7, 2019, while both were employed at Nulton. The Agency further finds that Dr. F. never supervised Respondent during that time period. Further, as noted by the ALJ, there was no regular review of patient records, no reports of Respondent's activities, and no channels of communication at all between Respondent and Dr. F. RD, at 25.[11] Dr. F. and Respondent only ever spoke once, and that was prior to the time the Agreement was entered.

The Agency further finds that Respondent left Nulton in August of 2022. Thereafter, he issued 17 prescriptions to patients at a different practice, PA Treatment Center, where Dr. F. did not work and would not have access to the patient's records. It is undisputed that Respondent was not covered by any supervisory agreement at the time those prescriptions were issued. Even assuming Respondent truly believed that his agreement with Dr. F. remained valid,[12] the Agency,

---

[11] In his Exceptions, Respondent reiterates similar claims to his hearing testimony such as: "[t]here are cases where physician assistants have operated under an implied supervising agreement and where the specifics of such agreements were informally understood rather than formally documented"; Respondent's lack of communication with Dr. F. was "actually reflective of broader practices within the profession, where such supervisory relationships are often more formal than substantive"; and "[i]t is a common practice for physician assistants to operate with significant autonomy, despite what is often written in the formal agreements." Exceptions, at 2. However, Respondent provided no evidence to support these claims other than his testimony which has already been considered, and which is inconsistent with Dr. F.'s credible testimony as well as with Pennsylvania law. *Id.*; *see also* RD, at 22 (citing 49 Pa. Code § 18.122 ("An appropriate degree of supervision includes: (A) active and continuing overview of the physician assistant's activities . . . (B) Immediate availability of the supervising physician to the physician assistant for consultations. (C) Personal and regular review within 10 days by the supervising physician of the patient records upon which entries are made by the physician assistant.")); 49 Pa. Code § 18.158(a)(4) ("A physician assistant may only prescribe a drug for a patient who is under the care of the physician responsible for the supervision of the physician assistant."), § 18.158(d)(4) ("The supervising physician shall countersign the patient record within 10 days."), § 18.158(d)(3) ("The physician assistant shall report, orally or in writing, to the supervising physician within 36 hours, a drug prescribed or medication dispensed by the physician assistant while the supervising physician was not physically present . . . ."). As discussed throughout this Decision, Respondent's continued failure to provided supporting evidence for his claims repeatedly detracts from his overall credibility as well as the weight afforded to his unsupported statements.

[12] In his Exceptions, Respondent took issue with the ALJ's "assumption that [Respondent] should have known about the termination of his supervisory agreement" and claimed that "[t]he ALJ's expectations were not in accordance with the legal requirements of the state of Pennsylvania" which, Respondent alleges, "require[] clear and direct communication regarding the status of such agreements." Exceptions, at 3. Respondent provided no evidence or citations to the law to support this claim. *See supra* n.11. Regardless, as stated herein, the Agency finds that Respondent, even if he believed the agreement remained valid, had no reasonable belief that he could issue the relevant prescriptions pursuant to that agreement under the circumstances.

in agreement with the ALJ, does not believe that Respondent held a reasonable belief that he could rely on that agreement to issue prescriptions to patients at a practice at which Dr. F. had never worked and after not speaking with Dr. F. for over three years. RD, at 25. The Agency finds that Respondent issued the relevant prescriptions independently.

## II. DISCUSSION

### A. The Five Public Interest Factors

Under the Controlled Substances Act (CSA), "[a] registration . . . to . . . dispense a controlled substance . . . may be suspended or revoked by the Attorney General upon a finding that the registrant . . . has committed such acts as would render his registration under section 823 of this title inconsistent with the public interest as determined under such section." 21 U.S.C. § 824(a). In making the public interest determination, the CSA requires consideration of the following factors:

(A)   The recommendation of the appropriate State licensing board or professional disciplinary authority.
(B)   The [registrant's] experience in dispensing, or conducting research with respect to controlled substances.
(C)   The [registrant's] conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.
(D)   Compliance with applicable State, Federal, or local laws relating to controlled substances.
(E)   Such other conduct which may threaten the public health and safety.

21 U.S.C. § 823(g)(1).

The Agency considers these public interest factors in the disjunctive. *Robert A. Leslie, M.D.*, 68 Fed. Reg. 15,227, 15,230 (2003). Each factor is weighed on a case-by-case basis. *Morall v. Drug Enf't Admin.*, 412 F.3d 165, 173-74 (D.C. Cir. 2005). Any one factor, or combination of factors, may be decisive. *David H. Gillis, M.D.*, 58 Fed. Reg. 37,507, 37,508 (1993).

The Government has the burden of proof in this proceeding. 21 C.F.R. § 1301.44. While the Agency has considered all of the public interest factors in 21 U.S.C. § 823(g)(1), the Government's evidence in support of its *prima facie* case for revocation of Respondent's registration is confined to Factors B and D. RD, at 15; *see also id.* at 15 n.33 (finding that Factors A, C, and E do not weigh for or against revocation).

Having reviewed the record and the RD, the Agency agrees with the ALJ, adopts the ALJ's analysis, and finds that the Government's evidence satisfies its *prima facie* burden of showing that Respondent's continued registration would be "inconsistent with the public interest." 21 U.S.C. § 824(a)(4); RD, at 13-26.

### B. Factors B and D

Evidence is considered under Public Interest Factors B and D when it reflects compliance (or non-compliance) with laws related to controlled substances and experience dispensing controlled substances. *See Sualeh Ashraf, M.D.*, 88 Fed. Reg. 1,095, 1,097 (2023); *Kareem Hubbard, M.D.*, 87 Fed. Reg. 21,156, 21,162 (2022). In the current matter, the Government has alleged that Respondent violated numerous federal and state laws regulating controlled substances. OSC, at 1-2. Specifically, federal law requires that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).[13] As for state law, Pennsylvania regulations provide that a physician assistant may only perform medical services as approved within a written agreement with a supervising physician; "shall not independently prescribe or dispense drugs"; and may not "[p]rescribe or dispense drugs except as

---

[13] The Agency need not adjudicate the criminal violations alleged in the instant OSC. *Ruan v. United States*, 142 S. Ct. 2370 (2022) (decided in the context of criminal proceedings).

described in the written agreement." 49 Pa. Code § 18.152(a)(2); 63 Pa. Cons. Stat. § 422.13(a), (e), (f).

In the current matter, the Agency agrees with the ALJ's analysis that Respondent repeatedly issued controlled substance prescriptions outside the usual course of professional practice by issuing such prescriptions while lacking an active agreement with a supervisory physician as required by state law. RD, at 17-18. Indeed, as noted by the ALJ, Respondent failed to maintain any supervisee/supervisor relationship, and with Dr. F. in particular, "Respondent's failure to communicate at all with [Dr. F.] – even when Respondent changed employers – makes it hard to accept that Respondent truly believed he still had an active supervisory agreement with [Dr. F.]." *Id.* at 18.[14]

As Respondent's conduct displays clear violations of the federal and state regulations described above, the Agency agrees with the ALJ and hereby finds that Respondent repeatedly violated federal and state law relating to controlled substances. *Id.* at 26. Accordingly, the Agency agrees with the ALJ and finds that Factors B and D weigh in favor of revocation of

---

[14] In his Exceptions, Respondent argues that the ALJ's "federal interpretation of Pennsylvania law is overly strict and inconsistent with actual state practices," but fails to provide any evidence supporting this claim other than noting the lack of action against Respondent by the Pennsylvania state board of medicine. Exceptions, at 2; *see also id.* at 4 ("[Respondent] maintains a Pennsylvania state license, suggesting that the state regulatory body did not find [his] actions sufficiently harmful to merit any kind of sanction"). As mentioned above, the lack of state action against Respondent was addressed by the ALJ in his analysis of public interest Factor A. *See* RD, at 15 n.33. Respondent also claims that "the ALJ lacks the necessary expertise to interpret state-specific legal standards correctly . . . [and] does not understand the nuances of how supervising agreements are communicated and understood in the context of Pennsylvania law, thereby leading to an incorrect conclusion about [Respondent's] compliance." According to Respondent, "Pennsylvania law does not explicitly define the frequency or nature of interaction required between a supervising physician and a physician assistant. The law allows for varying degrees of supervision, therefore the [ALJ] applied an unduly stringent standard." *Id.* To these arguments, the Agency notes that Respondent had ample opportunity in presenting his case-in-chief to offer testimony from an expert witness regarding Pennsylvania standards, but did not do so. The Agency also reiterates that Respondent has repeatedly failed to provide citation to specific Pennsylvania law. *See supra* n.5, 7, 11, 12. As such, the Agency, in agreement with the ALJ, has considered the plain language of the relevant Pennsylvania law and the record as a whole in making its analysis.

Respondent's registration and thus finds Respondent's continued registration to be inconsistent with the public interest in balancing the factors of 21 U.S.C. § 823(g)(1). *Id.*[15]

## III.   SANCTION

Where, as here, the Government has established sufficient grounds to revoke Respondent's registration, the burden shifts to the registrant to show why he can be entrusted with the responsibility carried by a registration. *Garret Howard Smith, M.D.*, 83 Fed. Reg. 18,882, 18,910 (2018). When a registrant has committed acts inconsistent with the public interest, he must both accept responsibility and demonstrate that he has undertaken corrective measures. *Holiday CVS, L.L.C., dba CVS Pharmacy Nos 219 and 5195*, 77 Fed. Reg. 62,316, 62,339 (2012) (internal quotations omitted). Trust is necessarily a fact-dependent determination based on individual circumstances; therefore, the Agency looks at factors such as the acceptance of responsibility, the credibility of that acceptance as it relates to the probability of repeat violations or behavior, the nature of the misconduct that forms the basis for sanction, and the Agency's interest in deterring similar acts. *See, e.g., Robert Wayne Locklear, M.D.*, 86 Fed. Reg. 33,738, 33,746 (2021).[16]

---

[15] In his Exceptions, Respondent argues that there is no evidence of any harm or abuse resulting from his prescribing at issue. Exceptions, at 4. Agency precedent is clear that proof of actual, subsequent harm is not required when a registrant has acted inconsistently with the public interest. *Melanie Baker, N.P.*, 86 Fed. Reg. 23,998, 24,009 (2021); *Larry C. Daniels, M.D.*, 86 Fed. Reg. 61,630, 61,660-61 (2021); *Jeanne E. Germeil, M.D.*, 85 Fed. Reg. 73,786, 73,799 n.32 (2020). Respondent also argues that revoking his registration "is not in the public interest, especially since he provides critical specialized psychiatric care that is not easily replaceable." Exceptions, at 5. Nonetheless, "[t]he CSA requires [the Agency] to consider Respondent's controlled substance dispensing experience, among other things, not whether Respondent's practice of medicine as a whole [is] beneficial to the community." *Brenton D. Wynn, M.D.*, 87 Fed. Reg. 24,228, 24,258 n.KK (2022) (citing *Frank Joseph Stirlacci, M.D.*, 85 Fed. Reg. 45,229, 45,239 (2020) (declining to accept community impact arguments); *Richard J. Settles, D.O.*, 81 Fed. Reg. 64,940, 64,945 n.16 (2016)).

[16] In his Exceptions, Respondent argues that "[t]he expectation of unequivocal acceptance of responsibility does not consider the complexity of this individual case" and asserts that "it is reasonable and entirely appropriate for [Respondent] to partially acknowledge fault while also presenting legitimate explanations or mitigating factors for his actions. It is also objectively true that [Respondent] has taken the steps necessary already to ensure complete rectification and future compliance." Exceptions, at 4. The Agency has held repeatedly that "[a] registrant's acceptance of responsibility must be unequivocal, or relief for sanction is not available, and where there is equivocation any evidence of remedial measures is irrelevant." *Fares Jeries Rabadi, M.D.*, 87 Fed. Reg. 30,564,

Here, and as noted by the ALJ, Respondent did admit some fault regarding his use of auto-populated settings identifying Dr. M. as the supervising physician during the relevant time despite the fact that his written agreement with Dr. M. had been inactivated in December 2021. RD, at 27-28; Tr. 92-93. Respondent also acknowledged that his agreement with Dr. F. was indeed inactivated in October 2019 based on the termination letter introduced into evidence by the Government. RD, at 28; Tr. 85-86; *see* GX 14. However, as noted by the ALJ, Respondent repeatedly asserted that he believed that he was covered by his agreement with Dr. F. when he issued the prescriptions at issue and that he had not received notice of the inactivation of their agreement. RD, at 28; Tr. 67-69, 81, 86, 98. Further, "Respondent did not find his lack of communication with [Dr. F.] as grounds for concern, and indicated that he regularly treats patients without communicating with a supervising physician." RD, at 28; Tr. 83-84, 96-97, 101-102. Respondent "further justified his conduct, testifying that patients under his care were at risk of withdrawal effects had he ceased issuing prescriptions." RD, at 28; Tr. 71-81. As the ALJ concluded, "[t]his explanation completely discounts the Respondent's responsibility to transfer care to another practitioner when learning that he can no longer provide the needed care, and further emphasizes the fact that the Respondent was essentially operating as a solo practitioner with no established relationship with a supervising physician who could assume care." RD, at 28.

Notably, in his Exceptions, Respondent asserted that "Pennsylvania law regarding the supervision of physician assistants places the responsibility of supervision on the supervising physician, not the physician assistant." Exceptions, at 3 (citing 49 Pa. Code § 18.142; 63 Pa. Cons. Stat. § 422.13). Respondent also claimed that "[i]f the supervising physician fails to fulfill

---

30,608 n.39 (2022) (citing *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. 74,800, 74,801, 74,810 (2015)); *see also Lon F. Alexander, M.D.*, 82 Fed. Reg. 49,704, 49,728 (2017) (collecting cases).

these responsibilities, the fault does not lie with the PA, especially if the PA was acting under the assumption of being properly supervised." *Id.* Nowhere in the Pennsylvania law cited by Respondent does it appear to place the sole responsibility on the supervising physician for a physician assistant's actions. Moreover, this argument demonstrates a blatant attempt by Respondent to shift the blame to his supervising physician for his own failure to exercise basic due diligence in staying apprised of whether an agreement critical to the propriety of his work as a physician's assistant remained active. Respondent also attempted to shift the blame to the PALS system, stating in his Exceptions that "[i]t is unreasonable to expect [Respondent] not to consider the information in an official state licensing portal accurate or to expect it to be error-prone. The responsibility lies with the state to make sure the system is functioning properly." Exceptions, at 3. As previously noted, Respondent himself acknowledged that the PALS system can be inaccurate regarding the dates for current agreements, *see supra* I.2; Tr. 64, and once again, basic due diligence on the part of Respondent as well as proper and ongoing communication with his supervising physician would have ensured that Respondent would not have needed to rely solely on PALS to know whether their supervising agreement remained active.

Ultimately, the ALJ concluded, and the Agency agrees, that Respondent has not demonstrated unequivocal acceptance of responsibility for his actions. *Id.* (citing *Jones Total Health Care Pharmacy, L.L.C. & SND Health Care, L.L.C.*, 81 Fed. Reg. 79,188, 79,201-02 (2016)).[17]

---

[17] When a registrant fails to make the threshold showing of acceptance of responsibility, the Agency need not address the registrant's remedial measures. *Ajay S. Ahuja, M.D.*, 84 Fed. Reg. 5,479, 5,498 n.33 (2019) (citing *Jones Total Health Care Pharmacy*, 81 Fed. Reg. at 79,202-03); *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. 74,800, 74,801, 74,810 (2015). Even so, in the current matter, the ALJ noted, and the Agency has considered, that Respondent is presently covered by a written agreement with Dr. P. RD, at 28 n.44; Tr. 63-64; RX 1, at 3.

In addition to acceptance of responsibility, the Agency considers both specific and general deterrence when determining an appropriate sanction. *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. at 74,810. In this case, the Agency agrees with the ALJ that, regarding specific deterrence, "there is no reason to believe that the Respondent's behavior will not recur in the future, as he failed to accept responsibility and repeatedly attempted to justify his conduct." RD, at 29 (citing *Gilbert Y. Kim, D.D.S.*, 87 Fed. Reg. 21,139, 21,144-45 (2022)). Further, the Agency agrees with the ALJ that the interests of general deterrence also support revocation, as a lack of sanction in the current matter would send a message to the registrant community that "one can ignore the law and yet incur no consequences from having done so." *Id.* at 29-30 (citing *Joseph Gaudio, M.D.*, 74 Fed. Reg. 10,083, 10,095 (2009)). Moreover, the Agency agrees with the ALJ that Respondent's actions were egregious, as Respondent issued seventeen controlled substance prescriptions to multiple patients without an active written agreement in place with a supervising physician. *Id.* at 29.[18]

In sum, Respondent has not offered any credible evidence on the record to rebut the Government's case for revocation of his registration and Respondent has not demonstrated that he can be entrusted with the responsibility of registration. *Id.* at 30. Accordingly, the Agency will order that Respondent's registration be revoked.[19]

---

[18] In his Exceptions, Respondent argues that "even if it is believed that [Respondent] is guilty of misconduct, that misconduct . . . was not of a severity that warrants the extreme measure of revocation." Exceptions, at 4. Respondent also claims, without citing to any specific Agency precedent, that "[s]imilar or more severe violations have resulted in lesser punishments, such as fines, reprimands, or temporary suspension" and "revocation would represent an inconsistency in the application of penalties." *Id.* The Agency possesses discretion to order a sanction lesser than revocation, however, the Agency finds that "exercising that discretion here would ill-serve the public interest" because "Respondent has not shown that [he] can be entrusted with the responsibility carried by [his] registration – having failed to accept responsibility for [his] conduct, [the Agency has] no assurance that Respondent would not repeat the conduct if [he was] to retain a registration." *The Pharmacy Place*, 86 Fed. Reg. 21,008, 21,016 (2021).

[19] For his final Exception, Respondent argues that the ALJ's removal restrictions are unconstitutional under *Jarkesy v. SEC*, which held that the removal protections for ALJs of the Securities and Exchange Commission (SEC) are unconstitutional (while declining to decide whether that conclusion would entitle the plaintiff to vacatur of the challenged agency decision). *Jarkesy v. SEC*, 34 F.4th 446, 463-465, 463 n.17 (5th Cir. 2022), *aff'd on other*

14

# ORDER

Pursuant to 28 C.F.R. § 0.100(b) and the authority vested in me by 21 U.S.C. § 824(a), I

hereby revoke DEA Certificate of Registration No. MM3329578 issued to Stephen McCarthy,

P.A. Further, pursuant to 28 C.F.R. § 0.100(b) and the authority vested in me by 21 U.S.C. §

823(g)(1), I hereby deny any pending applications of Stephen McCarthy, P.A., to renew or

modify this registration, as well as any other pending application of Stephen McCarthy, P.A., for

additional registration in Pennsylvania. This Order is effective **[insert Date Thirty Days From

the Date of Publication in the Federal Register].**

Date:  **AUG 1 9 2024**

Anne Milgram
Administrator

---

*grounds, SEC v. Jarkesy,* 603 U.S. ___ (2024), No. 22-859 (June 27, 2024). *Jarksey* was decided on the understanding that "the SEC Commissioners may only be removed by the President for good cause," and thus there were "two layers of insulation" that "impede[d] the President's power to remove" the SEC's ALJs. *Id.* at 464-465. By contrast, there is no doubt that the President may remove the Attorney General at will. Accordingly, *Jarkesy* can and should be distinguished from the instant situation with respect to DEA's ALJs, and the Agency finds Respondent's Exception to be unpersuasive.

EXHIBIT B



US. Department of Justice
Drug Enforcement Administration

---

*Office of the Administrator*            *Springfield, VA 22152*

September 9, 2024

**IN THE MATTER OF**

Stephen McCarthy, P.A.
6081 Hamilton Blvd
Suite 600
Allentown, PA 18106

DEA Certificate of Registration Number MM3329578

## ORDER TO SHOW CAUSE AND
## IMMEDIATE SUSPENSION OF REGISTRATION

**PURSUANT** to Sections 303 and 304 of the Controlled Substances Act, Title 21, United States Code, Sections 823 and 824,

**NOTICE** is hereby given to inform Stephen McCarthy, P.A. of the immediate suspension of Drug Enforcement Administration (DEA) Certificate of Registration (COR) No. MM3329578 pursuant to 21 U.S.C. § 824(d), because your continued registration constitutes "an imminent danger to the public health or safety." Notice is also given to afford you an opportunity to show cause before the DEA at the DEA Hearing Facility located at 700 Army Navy Drive, 2nd Floor, Arlington, Virginia 22202, or a location designated by the Administrative Law Judge, on November 6, 2024, or on such a subsequent date designated by the Administrative Law Judge (if you request such a hearing and file an answer), as to why DEA should not revoke your DEA COR, pursuant to 21 U.S.C. § 824(a)(4), and deny any pending applications, or for additional DEA registrations, because your continued registration is inconsistent with the public interest, as that term is defined in 21 U.S.C. § 823(g)(1).

As detailed below, this Order states DEA's basis for this Order to Show Cause and Immediate Suspension of Registration, including a *non-exhaustive summary* of the matters of fact and law at issue, as well as citations to laws and regulations that you have violated. In order to preserve your rights in this proceeding, you may appear in this proceeding by filing a notice of appearance or request for hearing and filing an answer in the manner prescribed by regulations within 30 days from the receipt of this Order.

As recently as June 21, 2024, you unlawfully issued controlled substance prescriptions due to the lack of a written agreement with a supervising physician, as required by Pennsylvania law. *See* 49 Pa. Code § 18.152(a)(2); 63 Pa. Cons. Stat. § 422.13(f).

## LEGAL REQUIREMENTS

Federal law proscribes any person from distributing or dispensing a controlled substance except as authorized by the Controlled Substances Act (CSA). *See* 21 U.S.C. §§ 841(a)(1), 842(a)(1). A prescription for a controlled substance is legitimate only if "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a); *see, e.g., MacKay v. DEA*, 664 F.3d 808, 815–16 (10th Cir. 2011) (applying state law to determine if a prescription complied with 21 C.F.R. § 1306.04(a)); *Marcia L. Sills, M.D.*, 82 Fed. Reg. 36,423, 36,443-44 (2017) (discussing 21 C.F.R. § 1306.04(a)). "A [practitioner] who engages in the unauthorized practice of [his profession] is not a 'practitioner acting in the usual course of professional practice.'" *United Prescription Servs., Inc.*, 72 Fed. Reg. 50,397, 50,407 (2007). "A controlled-substance prescription issued by a [practitioner] who lacks the license necessary to practice [his profession] within a State is therefore unlawful under the CSA." *Id.*

In addition to complying with the above-cited federal statutes and regulations, as a Commonwealth of Pennsylvania physician assistant, you are also required to comply with applicable Commonwealth of Pennsylvania laws and regulations, including, but not limited to:

- 63 Pa. Cons. Stat. § 422.13(a), (e), which authorizes a physician assistant to perform medical services insofar as those services are approved and identified within a written agreement with a supervising physician.

- 63 Pa. Cons. Stat. § 422.13(f), which states that "[a] physician assistant shall not independently prescribe or dispense drugs."

- 49 Pa. Code § 18.152(a)(2), which prohibits a physician assistant from "[p]rescrib[ing] or dispens[ing] drugs except as described in the written agreement."

## BACKGROUND

1. You are registered with DEA as a mid-level practitioner-physician assistant in Schedules II through V under DEA COR No. MM3329578. Your registered address is 6081 Hamilton Blvd, Suite 600, Allentown, PA 18106. Your COR expires by its own terms on January 31, 2027.

2. You currently possess a Commonwealth of Pennsylvania physician assistant license, under state license number MA057132. Your state license expires by its own terms on December 31, 2024.

## PERIOD OF LACK OF STATE AUTHORITY AND UNLAWFUL PRESCRIBING OF CONTROLLED SUBSTANCES

3. Pursuant to 49 Pa. Code § 18.152, on or about November 9, 2022, you had been covered by a written agreement with a supervising physician that gave you the authority to prescribe or dispense controlled substances. On or about April 12, 2024,

2

you were notified by the Commonwealth of Pennsylvania, Department of State, Bureau of Professional and Occupational Affairs, via electronic mail, this written agreement was inactivated.

4. Between on or about April 12, 2024 and June 23, 2024 you were not party to any written agreement with a supervising physician. Consequently, you were without authority to handle or prescribe controlled substances in the Commonwealth of Pennsylvania, the state in which you are registered with DEA. During this same period, you unlawfully issued at least 28 prescriptions for controlled substances.

5. Pursuant to 49 Pa. Code § 18.152, on or about June 23, 2024, you should have been covered by a written agreement with a supervising physician that gave you the authority to prescribe or dispense controlled substances.

6. Because you issued the above controlled substance prescriptions while you lacked any written agreement that provided you authority to perform these medical services, as required by the Commonwealth of Pennsylvania, your issuance of these prescriptions was outside the usual course of professional practice. *See, e.g., Mohammed F. Abdel-Hameed, M.D.*, 74 Fed. Reg. 61,366, 61,369 (2009) ("A controlled-substance prescription issued by a physician who lacks the license or authority required to practice medicine within a State is therefore unlawful under the CSA."); *United Prescription Servs., Inc.*, 72 Fed. Reg. at 50,407 (instructing that the unauthorized practice of medicine is outside the usual course of professional practice). Your issuance of these prescriptions therefore violated federal and Commonwealth of Pennsylvania law relating to controlled substances.

**IMMINENT DANGER**

As recently as June 21, 2024, you unlawfully prescribed controlled substances to individuals outside of the usual course of professional practice. Given your history of unlawful prescribing set forth above, your ongoing prescribing of controlled substances in violation of the standard of care poses an "imminent danger" within the meaning of 21 U.S.C. § 824(d).

IN view of the foregoing, and pursuant to 21 U.S.C. §§ 823(g)(1) and 824(a)(4), it is the Agency's preliminary finding that your continued registration is inconsistent with the public interest. It is the Agency's preliminary finding that on numerous occasions, you issued prescriptions outside the usual course of professional practice and not for a legitimate medical purpose, which is inconsistent with the public interest. It is also the Agency's preliminary finding, based on the facts and circumstances described above, and in light of the rampant and deadly problem of prescription controlled substance abuse, that your continued registration during the pendency of these proceedings would constitute "an imminent danger to the public health or safety" because of the substantial likelihood of an imminent threat that death, serious bodily harm, or abuse of controlled substances will occur in the absence of this suspension. *See* 21 U.S.C. § 824(d). Accordingly, pursuant to the provisions of 21 U.S.C. § 824(d) and 21 C.F.R. § 1301.36(e), and the authority granted to the Agency under 28 C.F.R. § 0.100, DEA COR No. MM3329578 is hereby suspended effective immediately.

3

Such suspension shall remain in effect until a final determination is reached in these proceedings.

**PURSUANT** to 21 U.S.C. § 824(f) and 21 C.F.R. § 1301.36(f), the Special Agents and Diversion Investigators of DEA who serve this Order to Show Cause and Immediate Suspension of Registration are authorized to place under seal or to remove for safekeeping all controlled substances that you possess pursuant to the registration which the Agency has herein suspended. The said Agents and Investigators are also directed to take into their possession your DEA COR No. MM3329578 and any unused order forms and prescription pads bearing your DEA COR No. MM3329578.

**THE** following procedures are available to you in this matter:

1. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, you may file with DEA a written request for a hearing and an answer in the form set forth in 21 C.F.R. § 1316.47. *See* 21 C.F.R. § 1301.43(a). If you fail to file such a request, the hearing shall be cancelled in accordance with paragraph 3, below.

2. Should you request a hearing and fail to timely file an answer, plead, or otherwise defend, or should you request a hearing and file an answer and then fail to appear at the designated hearing, you shall be deemed to have waived the right to a hearing and to be in default, and DEA may enter an order terminating the proceeding. *See* 21 C.F.R. §§ 1301.43(c)(2), (c)(3), (d).

3. Default constitutes a waiver of your right to hearing and an admission of the factual allegations of this Order to Show Cause and Immediate Suspension of Registration. *See* 21 C.F.R. § 1301.43(e). In the event that you are deemed in default or an order terminating the proceedings has been issued, DEA may enter a default final order pursuant to 21 C.F.R. § 1316.67. *See* 21 C.F.R. § 1301.43(f)(1).

Requests for hearing and your answer should be filed by email with the Office of Administrative Law Judges at the following address ECF-DEA@dea.gov, with a copy simultaneously provided to the Government at the following address: DEA.Registration.Litigation@dea.gov.

Correspondence concerning this matter, including the request referenced above, should be addressed to the Hearing Clerk, Office of Administrative Law Judges, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152. A copy of the same shall also be served on Government Counsel, Jennifer L. Holsclaw, and be addressed to the Office of Chief Counsel, Diversion Section, 8701 Morrissette Drive, Springfield, VA 22152.

Anne Milgram
Administrator
Drug Enforcement Administration

cc: Hearing Clerk, Office of Administrative Law Judges
Jennifer L. Holsclaw, Counsel for the Government